United States District Court
Middle District of Florida
Jacksonville Division

ASAP TREE SERVICE LLC,

    *Plaintiff,*

v.                                                            NO. 3:24-cv-778-TJC-PDB

L.A. DISASTER RELIEF, LLC,

    *Defendant.*

---

## Report and Recommendation[1]

    The plaintiff, a tree service, alleges that the defendant, a disaster-relief service, owes the plaintiff money for services performed after a derecho devastated the Midwest. *See* D1. The clerk entered default against the defendant. D20. The plaintiff now moves for default judgment, requesting $236,949.00 in damages, pre- and post-judgment interest, and a ruling on entitlement to costs. D22 (motion), D28-1 (updated pre-judgment interest table), D31 (supplement), D32 (supplement).

### I.    Procedural History

    On August 1, 2024, the plaintiff filed the complaint. D1.

    On November 25, 2024, the court ordered the plaintiff to file proof of service and show cause why the case should not be dismissed for failure to

---

[1]Citations to page numbers are to page numbers generated by CM/ECF.

prosecute. D7. The plaintiff explained that it had attempted to serve process "at least" six times. D11 ¶ 4. The plaintiff also explained that it planned to effectuate substitute service through the Florida Secretary of State and moved for an extension of time to serve process. D11 ¶¶ 5–8. The court discharged the order to show cause and extended the deadline. D13.

On December 5, 2024, the plaintiff filed an "alias summons" for service on the Florida Secretary of State, acting as the defendant's agent. D10. The next day, the clerk issued the summons. D12.

On January 2, 2025, the plaintiff moved for an additional extension of time to serve process because its request for substitute service remained pending. D14 ¶ 6. The court granted the motion and extended the deadline again. D15.

On January 20, 2025, the plaintiff filed a declaration by its counsel detailing the plaintiff's compliance with Florida's substitute-service requirements. D16 (declaration), D16-1 to D16-8 (exhibits).

On February 25, 2025, the plaintiff moved for an extension of time to move for default, explaining that a lawyer had contacted the plaintiff's lawyer and stated that he had planned to represent the defendant but could not because he could not appear virtually "for certain events." D17 ¶¶ 2–3. The lawyer asked the plaintiff for an extension of time to March 7, 2025, for the defendant to respond to the complaint with new counsel. D17 ¶¶ 3–5. The court granted the motion and extended the deadline to move for default. D18.

On March 14, 2025, the plaintiff moved for default. D19. On March 25, 2025, the clerk entered default. D20.

On April 30, 2025, the court ordered the plaintiff to show cause why the case should not be dismissed for failure to prosecute. D21. The plaintiff responded by applying for default judgment, D22, and moving for an extension of time "nunc pro tunc" to apply for default judgment, D23. The plaintiff's counsel explained that his staff had mis-calendared the deadline to apply for default judgment, argued that the delay was brief and had created no prejudice, and represented that the plaintiff had not intended to flout the deadline. D23, D24, D25. The court discharged the order to show cause, granted the motion, and considered the application timely. D26.

On October 1, 2025, the court ordered the plaintiff to correct and update its pre-judgment interest table. D27. The plaintiff complied. D28, D28-1.

On December 2, 2025, the court conducted a hearing on the motion for default judgment. The court ordered the plaintiff to supplement the motion. D30. The plaintiff supplemented the motion. D31, D32.

## II.    Complaint

### A.    *Factual Allegations*

The plaintiff is an Indiana limited liability company, D1 ¶¶ 1, 6, that provides tree services, including disaster-relief services, to the arboriculture industry in Indiana and the surrounding areas, D1 ¶ 8. The plaintiff's sole member is Saul Vasquez Tadeo, an Indiana resident and a Mexican citizen with permanent residency in the United States. D1 ¶ 2; *see also* D9 at 2 (disclosure statement explaining that Vasquez Tadeo is both residing and domiciled in Indiana).

3

The defendant is a Florida limited liability company with its principal place of business in Interlachen, Florida. D1 ¶ 3. The defendant's sole member is Kyle Adams, an Interlachen resident and Florida citizen. D1 ¶ 4.

On August 10 and 11, 2020, "a powerful 'derecho' storm swept across" the Midwest, causing approximately $11 billion in damages. D1 ¶ 9. The defendant asked the plaintiff to serve as a subcontractor to provide emergency clean-up services, including services on behalf of the Federal Emergency Management Agency (FEMA). D1 ¶¶ 10, 46. The companies "entered into an oral contract for services," under which the defendant agreed to pay the plaintiff 80% of all invoices that the plaintiff submitted to the defendant, "with the remaining 20% representing the profit and overhead" that the defendant would retain. D1 ¶¶ 34, 47.

From August to November 2020, the plaintiff trimmed trees and removed debris. D1 ¶¶ 11, 35, 41, 49. The plaintiff engaged in ongoing work through an ongoing business relationship with the defendant. D1 ¶ 29. Through "communications" between the parties, the defendant knew that the plaintiff was performing the services. D1 ¶¶ 42, 48. Some work was performed under the defendant's FEMA contract; other work was performed for the defendant, with payment made to the defendant by the property owner, the property owner's insurer, or both. D1 ¶¶ 12, 43.

In accord with their business dealings, the plaintiff would perform the services and send the defendant invoices, deducting the 20% for the defendant's profit. D1 ¶¶ 14–16, 25–26, 36, 49; D1-3. The defendant never objected to, or disputed, the amounts in the invoices, D1 ¶¶ 18, 28, and "agreed to owe" the invoice amounts, D1 ¶¶ 17, 27. The defendant has paid $176,000.00. D1 ¶¶ 21, 32, 37, 51. A balance of $236,949.00 remains. D1 ¶¶ 21,

4

32, 38. The plaintiff demanded that the defendant pay the balance, but the defendant has not. D1 ¶¶ 20, 23, 31, 39, 44, 52, 53.

The plaintiff sent 22 invoices with broad descriptions of the work to the defendant:

| # | Date | Description of Services | Amount |
|---|------|------------------------|--------|
| 1 | 8/19/20 | "clean the community broken trees remove hangers, all brush and wood stuck near the road[.] Total of 55,000 minus 15,000 leaving us total of 40,000 thousand" | 40,000.00 |
| 2 | 8/22/2020 | "Remove several trees of gold leaf community stuck all the bush to the main stree[t.] Total cost of the job $54,000 minus 20% leaving us 43,200" | 43,200.00 |
| 3 | 8/25/2020 | "Removed broken trees, cut small pieces make it safe for the home owner no clean up. Total cost of the job $5000 minus 20% leaving us $4000" | 4,000.00 |
| 4 | 8/25/2020 | "We are subcontractors for L.A. Disaster Relief Tree Service during post-storm on Cedar Rapids, Iowa. Removed broken tree, cut small piece make safe for the homeowner not clean up. Total cost of the job $5,000 minus 20% leaving us $4,000k" | 4,000.00 |
| 5 | 8/28/2020 | "Remove broken trees, cut small pieces make it for the homeowner not clean up[.] missing pricing" | |
| 6 | 8/28/2020 | "Remove broken trees, cut small pieces[.] Make it safe for the home owner no clean up[.] total cost of the job $8500 minus 20% leaving us $6,800" | 6,800.00 |
| 7 | 8/30/2020 | "Remove broken trees, cut small pieces[.] Stuck everything by the road. Missing price" | |
| 8 | 8/30/2020 | "clean the property remove a broken tree all brush and wood stuck near the street[.] Derecho storm[.] Total cost of the job $7000 minus 20% leaving us $5600" | 5,600.0 |
| 9 | 8/31/2020 | "clean the property remove broken trees and hanger, all the brush and wood stuck near road[.] Total cost of the job $4500 minus 20% leaving us total of $3600[.] Derecho storm" | 3,600.00 |
| 10 | 9/1/2020 | "clean the property remove broken trees and hanger, all the brush and wood stuck near the road[.] Total cost of the job $9000 minus 20% leaving us of total of $7200[.] Derecho storm" | 7,200.00 |
| 11 | 9/1/2020 | "Removed broken tree, cut small pieces make it safe for the home owner no clean up[.] Total cost of the job 6000 minus 20% leaving us $4800" | 4,800.00 |
| 12 | 9/1/2020 | "Broken tree laying on anothers tree put all the wood on the main street and brush[.] total cost of the work $7000 minus 20% leaving us 5600" | 5,600.00 |
| 13 | 9/2/2020 | "We are subcontractors for LA Disaster Relief Tree Service during post storm Cedar Rapids Iowa[.] Removed broken trees, of small piece make safe for the home owner not clean up. Total cost of the wok $9,000k minus 20% leaving us $7,200k" | 7,200.00 |
| 14 | 9/3/2020 | "Trim a lot trees and remove all the fallen trees stuck all the brush and logs by the road. Total cost of the job $70,000 minus 20% leaving us 56,000" | 56,000.00 |

| 15 | 9/9/2020 | "We are subcontractors for LA Disaster Relief Tree Service. During post storm on Cedar Rapids Iowa. Removed broken tree, cut small piece make safe for the home owner not clean up. Total work cost $27,000k minus 20% leaving us $21,600" | 21,600.00 |
| 16 | Undated | "We are subcontractors for La Disaster Relief Tree Service[.] During post storm on Cedar Rapids Iowa. Removed broken tree, cut small pieces to make it safe for the owner not clean up[.] Total cost of the work $5,000k minus 20% leaving us 4,000k" | 4,000.00 |
| 17 | 9/28/2020 | "We are subcontractors for LA Disaster Relief Tree Service. During post storm Cedar Rapids Iowa. Removed broken tree, cut small pieces make safe for the home owner not to clean up. Mobile Home. Total job cost $20,000k minus 20% leaving us 16,000k" | 16,000.00 |
| 18 | 9/29/2020 | "We are subcontractors for LA Disaster Relief Tree Service during post storm on Cedar Rapids Iowa. Removed broken trees, cut small piece make safe for the home owner not clean up[.] Total job cost $8,300 minus 20% leaving us $6,640" | 6,640.00 |
| 19 | 10/3/2020 | "We are subcontractors for LA Disaster Relief Tree Service, during post storm on Cedar Rapids Iowa. Removed broken trees, cut small pieces make safe for the home owner not clean up. Total work cost $3,000 minus 20% leaving us $2,400k" | 2,400.00 |
| 20 | 10/3/2020 | "We are subcontractors for LA Disaster Relief Tree Service during post storm on Cedar Rapids Iowa. Removed broken trees, cut small pieces make safe for the home owner not clean up. Total tree work cost $3500 minus 20% leaving us $2,800" | 2,800.00 |
| 21 | Undated | "We are subcontractors for LA Disaster Relief Tree Service. During post storm on Cedar Rapid Iowa. Remove broken trees, cut small pieces make safe for the home owner not clean up. Total cost of the job $8,000 minus 20% leaving us $6,400" | 6,400.00 |
| 22 | 10/14/2020 | "Removed broken trees and hanger cut all the small brush, stuck all the wood in piles, removed all the hanger. We worked 12 days of $8000 a day total of $96,000 already taken 20% off, and 3 days of $4,000. Total $12,000 already take 20% off." | 108,000.00 |
|  |  |  | **355,840.00** |

*See* D1 ¶ 16; D1-3 at 2–23.

The plaintiff sent 8 invoices with more specific descriptions of the work—presumably using FEMA codes—to the defendant at its Interlachen address:

| # | Date | Description of Services | Amount |
|---|------|------------------------|--------|
| 1 | 9/20/2020–9/26/2020 | Removal of Hazardous Limbs (65 x 35.00 = 2,275.00)<br>Removal of Hazardous Trees 6"–12" (0 x 20.00 = 0.00)<br>Removal of Hazardous Trees 13"–23" (2 x 70.00 = 140.00)<br>Removal of Hazardous Trees 24"–36" (1 x 100.00 = 100.00)<br>Removal of Hazardous Trees 37"+ (0 x 190.00 = 0.00)<br>Subtotal = 2,515.00<br>"10% RETAINAGE" (251.50) | 2,263.50 |
| 2 | 9/27/2020–10/03/2020 | Removal of Hazardous Limbs (71 x 35.00 = 2,485.00)<br>Removal of Hazardous Trees 6"–12" (4 x 20.00 = 80.00) | 2,749.50 |

| | | | |
|---|---|---|---|
| | | Removal of Hazardous Trees 13"–23" (7 x 70.00 = 490.00)<br>Removal of Hazardous Trees 24"–36" (0 x 100.00 = 0.00)<br>Removal of Hazardous Trees 37"+ (0 x 190.00 = 0.00)<br>Subtotal = 3,055.00<br>"10% RETAINAGE" (305.50) | |
| 3 | 10/05/2020–<br>10/10/2020 | Removal of Hazardous Limbs (337 x 35.00 = 11,795.00)<br>Removal of Hazardous Trees 6"–12" (2 x 20.00 = 40.00)<br>Removal of Hazardous Trees 13"–23" (13 x 70.00 = 910.00)<br>Removal of Hazardous Trees 24"–36" (7 x 100.00 = 700.00)<br>Removal of Hazardous Trees 37"+ (0 x 190.00 = 0.00)<br>Subtotal = 13,445.00<br>"10% RETAINAGE" (1,344.50) | 12,100.50 |
| 4 | 10/11/2020–<br>10/17/2020 | Removal of Hazardous Limbs (501 x 35.00 = 17,535.00)<br>Removal of Hazardous Trees 6"–12" (0 x 20.00 = 0.00)<br>Removal of Hazardous Trees 13"–23" (2 x 70.00 = 140.00)<br>Removal of Hazardous Trees 24"–36" (0 x 100.00 = 0.00)<br>Removal of Hazardous Trees 37"+ (0 x 190.00 = 0.00)<br>Subtotal = 17,675.00<br>"10% RETAINAGE" (1,767.50) | 15,907.50 |
| 5 | 10/18/2020–<br>10/24/2020 | Removal of Hazardous Limbs (124 x 35.00 = 4,340.00)<br>Removal of Hazardous Trees 6"–12" (0 x 20.00 = 0.00)<br>Removal of Hazardous Trees 13"–23" (0 x 70.00 = 0.00)<br>Removal of Hazardous Trees 24"–36" (0 x 100.00 = 0.00)<br>Removal of Hazardous Trees 37"+ (0 x 190.00 = 0.00)<br>Subtotal = 4,340.00<br>"10% RETAINAGE" (434.00) | 3,906.00 |
| 6 | 10/18/2020–<br>10/24/2020 | Removal of Hazardous Limbs (379 x 35.00 = 13,265.00)<br>Removal of Hazardous Trees 6"–12" (0 x 20.00 = 0.00)<br>Removal of Hazardous Trees 13"–23" (0 x 70.00 = 0.00)<br>Removal of Hazardous Trees 24"–36" (0 x 100.00 = 0.00)<br>Removal of Hazardous Trees 37"+ (0 x 190.00 = 0.00)<br>Subtotal = 13,265.00<br>"10% RETAINAGE" (1,326.50) | 11,938.50 |
| 7 | 10/25/2020–<br>10/31/2020 | Removal of Hazardous Limbs (164 x 35.00 = 5,740.00)<br>Removal of Hazardous Trees 6"–12" (0 x 20.00 = 0.00)<br>Removal of Hazardous Trees 13"–23" (0 x 70.00 = 0.00)<br>Removal of Hazardous Trees 24"–36" (0 x 100.00 = 0.00)<br>Removal of Hazardous Trees 37"+ (0 x 190.00 = 0.00)<br>Subtotal = 5,740.00<br>"10% RETAINAGE" (574.00) | 5,166.00 |
| 8 | 10/25/2020–<br>10/31/2020 | Removal of Hazardous Limbs (85 x 35.00 = 2,975.00)<br>Removal of Hazardous Trees 6"–12" (0 x 20.00 = 0.00)<br>Removal of Hazardous Trees 13"–23" (0 x 70.00 = 0.00)<br>Removal of Hazardous Trees 24"–36" (0 x 100.00 = 0.00)<br>Removal of Hazardous Trees 37"+ (0 x 190.00 = 0.00)<br>Subtotal = 2,975.00<br>"10% RETAINAGE" (297.50) | 2,677.50 |
| | | | **56,709.00** |

*See* D1-3 at 24–72.

The invoices total $412,549.00.[2] D1-3.

## B.   *Claims*

The plaintiff brings five claims for relief under common law: account stated (count I), D1 ¶¶ 14–24; open account (count II), D1 ¶¶ 25–33; breach of oral contract (count III), D1 ¶¶ 34–40; breach of contract implied in law (count IV), D1 ¶¶ 41–45; and breach of contract implied in fact (count V), D1 ¶¶ 46–53.

## C.   *Demand*

For each count, the plaintiff demands damages, interest, costs, and any other relief the court considers "just and proper." D1 at 7, 10–13, 15. For the account-stated and breach-of-oral contract claims, the plaintiff specifies that it demands damages in the amount of $236,949.00 "based on the invoices." D1 at 7 (quoted), 12. For the open-account claim, the plaintiff specifies that it demands $236,949.00 "minus payments thereon." D1 at 10–11.

---

[2]In the complaint, the plaintiff alleges that the invoices total $412,949.00. D1 ¶¶ 19, 30. The plaintiff confirmed in the supplement that this was a typographical error, and the correct total of the invoices is $412,549.00. D31 at 2; *see* § III.C, *infra*.

## III.   Motion, Declaration, and Supplement

### A.   *Motion*

The plaintiff moves for default judgment on three of the five claims: account stated (count I), D1 ¶¶ 14–24; open account (count II),[3] D1 ¶¶ 25–33; and breach of oral contract (count III),[4] D1 ¶¶ 34–40. D22 ¶¶ 2–6. The plaintiff does not address the remaining two claims: breach of contract implied in law (count IV), D1 ¶¶ 41–45; and breach of contract implied in fact (count V), D1 ¶¶ 46–53. *See generally* D22.

The plaintiff asks the court to award damages "in the principal amount of $236,949.00, plus prejudgment interest of $68,604.03 through May 14, 2025

---

[3]"Actions for an account stated and an open account are two distinct causes of actions requiring different burdens of proof." *S. Motor Co. of Dade Cnty. v. Accountable Constr. Co.*, 707 So. 2d 909, 912 (Fla. 3d DCA 1998). An open account is an "unsettled debt arising from items of work and labor, goods sold and delivered with the expectation of further transactions subject to further settlement." *Cent. Ins. Underwriters, Inc. v. Nat'l Ins. Fin. Co.*, 599 So. 2d 1371, 1373 (Fla. 3d DCA 1992) (emphasis omitted). "It is not as easy as it should be to identify what does—or does not—constitute a cause of action for 'open account.'" *H & H Design Builders, Inc. v. Travelers' Indem. Co.*, 639 So. 2d 697, 700 (Fla. 5th DCA 1994). "It should not include express contracts or other obligations that have been reduced to writing." *Id.* "An obligation does not become an 'open account' simply because the amount due under a contract requires calculation." *Id.*

[4]The elements of a breach-of-contract claim are (1) a valid contract, (2) a material breach, and (3) damages. *Carl Domino, Inc. v. Dixon*, 413 So. 3d 157, 167 (Fla. 4th DCA 2025). A valid contract requires an offer, an acceptance of the offer, consideration, and "specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). "What constitutes the essential terms will vary widely according to the nature and complexity of each transaction and will be evaluated on a case by case basis," but "price is generally recognized as an essential element to a contract." *Acosta v. Dist. Bd. of Trs. of Mia.-Dade Cmty. Coll.*, 905 So. 2d 226, 228 (Fla. 3d DCA 2005) (internal quotation marks and quoted authority omitted). A party's failure to perform contractual obligations is a material breach when the failed obligations are "central to the contract." *JF & LN, LLC v. Royal Oldsmobile-GMC Trucks Co.*, 292 So. 3d 500, 509 (Fla. 2d DCA 2020).

(and such additional interest through May 31, 2025, at $59.40 per day), post-judgment interest, entitlement to recover its costs, and such other and further relief as the Court deems just and proper." D22 at 12.

## B.    Declaration

Vasquez Tadeo, as the plaintiff's "managing member" and someone with personal knowledge, provides a declaration under 28 U.S.C. § 1746 verifying the complaint's factual allegations. D22-1 ¶¶ 1, 13, 15, 17, 18. He includes the following additional facts. "When [the defendant] was paying the invoices submitted by [the plaintiff], it did so a few days after [the plaintiff] submitted each invoice to [the defendant]." D22-1 ¶ 14. The defendant "has not paid [the plaintiff] for [the] invoices … since December 1, 2020." D22-1 ¶ 16. The defendant "should have paid the invoices in full by December 1, 2020." D22-1 ¶ 19. The principal amount owed—$236,949.00—"has been owed since December 1, 2020." D22-1 ¶ 21. He includes an interest calculation, D22-2, later supplemented with interest through October 15, 2025, D28-1.

## C.    Supplement

In the plaintiff's court-ordered supplement to the motion for default judgment, the plaintiff addresses a discrepancy in the total invoice amount, updates the pre-judgment interest calculation, explains the basis for the asserted December 1 due date, and provides a second declaration of Vasquez Tadeo under § 1746. D31, D32-1. The plaintiff adds the following request: "Plaintiff also asks that the Court confirm that all work was completed as agreed and that the full amount of the invoices is due and payable." D31 at 12.

10

The plaintiff explains that a typographical error caused the discrepancy between the actual total of the invoices, D1-3, and the stated value from the complaint, D1 ¶¶ 19, 30. D31 at 2–3. Correcting this mistake, the plaintiff states that the defendant owes the plaintiff $236,549.00, not $236,949.00 as previously stated. D31 at 3. Using the correct total, the plaintiff now requests $81,669.31 in pre-judgment interest, calculated to December 23, 2025, "plus additional prejudgment interest accruing thereafter until the date of judgment." D31 at 9–11; D31-1. The plaintiff provides this updated prejudgment interest calculation:

| Updated Prejudgment Interest Calculator - ASAP Tree Service LLC | | | | | |
|---|---|---|---|---|---|
| Effective Date | Annual Interest Rate (%) | Daily Interest Rate | Daily Interest Amount | Days Effective | Interest Accrued ($) |
| 10/1/20 | 5.37% | 0.000146721 | $34.71 | 31 | $1,075.91 |
| 1/1/21 | 4.81% | 0.000131781 | $31.17 | 90 | $2,805.54 |
| 4/1/21 | 4.31% | 0.000118082 | $27.93 | 91 | $2,541.83 |
| 7/1/21 | 4.25% | 0.000116438 | $27.54 | 92 | $2,533.98 |
| 10/1/21 | 4.25% | 0.000116438 | $27.54 | 92 | $2,533.98 |
| 1/1/22 | 4.25% | 0.000116438 | $27.54 | 90 | $2,478.90 |
| 4/1/22 | 4.25% | 0.000116438 | $27.54 | 91 | $2,506.44 |
| 7/1/22 | 4.34% | 0.000118904 | $28.13 | 92 | $2,587.65 |
| 10/1/22 | 4.75% | 0.000130137 | $30.78 | 92 | $2,832.11 |
| 1/1/23 | 5.52% | 0.000151233 | $35.77 | 90 | $3,219.66 |
| 4/1/23 | 6.58% | 0.000180274 | $42.64 | 91 | $3,880.57 |
| 7/1/23 | 7.69% | 0.000210685 | $49.84 | 92 | $4,585.03 |
| 10/1/23 | 8.54% | 0.000233973 | $55.35 | 92 | $5,091.84 |
| 1/1/24 | 9.09% | 0.000248361 | $58.75 | 91 | $5,346.21 |
| 4/1/24 | 9.34% | 0.000255191 | $60.37 | 91 | $5,493.23 |
| 7/1/24 | 9.46% | 0.00025847 | $61.14 | 92 | $5,624.96 |
| 10/1/24 | 9.50% | 0.000259563 | $61.40 | 92 | $5,648.74 |
| 1/1/25 | 9.38% | 0.000256986 | $60.79 | 90 | $5,471.08 |
| 4/1/25 | 9.15% | 0.000250685 | $59.30 | 91 | $5,396.24 |
| 7/1/25 | 8.90% | 0.000243836 | $57.68 | 92 | $5,306.48 |
| 10/1/25 | 8.65% | 0.000236986 | $56.06 | 84 | $4,708.94 |
| | | | | | $81,669.31 |

| Principal | $236,549.00 |
|---|---|
| Since | Dec. 1, 2020 |

| Principal | $236,549.00 |
|---|---|
| Interest | $81,669.31 |
| Total | $318,218.31 |

D31-1.

The plaintiff argues that "unrebutted evidence shows" that the defendant "was to pay all outstanding invoice amounts no later than December 1, 2020." D31 at 8. According to the plaintiff, under the parties' oral agreement, the defendant had to pay the plaintiff "for each invoice in a timely manner after receiving payment from the relevant funding source[.]" D31 at 8. "In practice," the plaintiff explains, "this meant that once the projects were done and invoices were delivered (generally within two weeks of completion for private jobs), [the plaintiff] expected prompt payment." D31 at 8.

In the second declaration, Vasquez Tadeo adds the following facts. D32-1. The defendant agreed to compensate the plaintiff "at a reasonable rate, to be determined on a per-project basis, for the work performed." D32-1 ¶ 4. "For any project where the property owner or the property owner's insurance was responsible for payment," the defendant would retain 20% of the total amount owed as profit. D32-1 ¶ 6. "For any project funded through [the defendant]'s contract with [FEMA]," the defendant would retain 10% of the total amount owed as profit. D32-1 ¶ 7. The parties agreed that the defendant would pay the plaintiff "on a weekly basis … for the work completed two weeks prior—such that during the third week of work, [the plaintiff] would be paid for services performed in the first week; during the fourth week, for the second week's work; and so on." D32-1 ¶ 8. Before work on each project began, Vasquez Tadeo met with Adams, the sole member of the defendant, "to inspect the scope of work and mutually agree[] on the total price that [the plaintiff] would charge[.]" D32-1 ¶ 9. For privately funded projects, the plaintiff delivered the invoices to the defendant approximately ten to fifteen days after completing the project. D32-1 ¶ 10. For FEMA-funded projects, a FEMA-appointed monitor oversaw the plaintiff's work and issued a "ticket" voucher for each tree or limb that the plaintiff removed, the plaintiff collected the tickets and sent

them to the defendant for processing, and the defendant generated invoices using predetermined FEMA rates. D32-1 ¶ 12. The plaintiff performed all services requested by the defendant. D32-1 ¶ 14.

## IV.    Jurisdiction

### A.    *Subject-Matter Jurisdiction*

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction … of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State[.]" 28 U.S.C. § 1332(a)(2). Citizenship means domicile, which requires residency and an intent to remain indefinitely. *Travaglio v. Am. Exp. Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013).

"A limited liability company … is a citizen of any state of which a member of the company is a citizen." *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004). A foreign citizen admitted to the United States for permanent residence is a citizen of the foreign state. *Cavalieri v. Avior Airlines C.A.*, 25 F.4th 843, 848 (11th Cir. 2022).

The court has diversity jurisdiction. The amount in controversy is at least $236,549.00 as the amount allegedly owed, D1-3, D31 at 3; the plaintiff's sole member is a Mexican citizen with permanent residency in the United States who resides and is domiciled in Indiana, D1 ¶ 2, D9 at 2; and the

13

defendant's sole member is a Florida citizen (and thus a Florida domiciliary), D1 ¶ 4.

## B.    *Personal Jurisdiction*[5]

"Serving a summons … establishes personal jurisdiction over a defendant … who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located[.]" Fed. R. Civ. P. 4(k)(1)(A). Florida courts have jurisdiction over Florida companies. Fla. Stat. § 48.193(1)(a)(1).

The court has jurisdiction over the defendant because the plaintiff served process, D16, D16-1 to D16-8, *see* § V, *infra*; and the defendant is a Florida company, D1 ¶ 3.

## V.    **Default**

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a).

---

[5]A judgment entered without personal jurisdiction over a defendant is void as to that defendant. *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009). Still, no binding precedent of which the undersigned is aware requires a court to decide personal jurisdiction before entering a default judgment. Indeed, deciding personal jurisdiction in the default-judgment context can be difficult because the briefing is one-sided and jurisdictional facts learned through discovery are absent. A defaulting defendant retains the ability to challenge a void default judgment. *See* Fed. R. Civ. P. 60(b)(4) ("On motion and just terms, the court may relieve a party … from a final judgment" on the ground that "the judgment is void[.]"). The undersigned analyzes personal jurisdiction here because personal jurisdiction over the defendant, a Florida company, is straightforward.

A plaintiff may serve an unincorporated association by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made[.]" Fed. R. Civ. P. 4(e)(1), (h)(1)(A).

Florida law specifies how to serve process on a Florida limited liability company:

> (2) A domestic limited liability company … may be served with process … on its registered agent designated by the … company[.]
>
> (3) If service cannot be made on a registered agent … because the domestic limited liability company … ceases to have a registered agent, or if the registered agent of the … company … cannot otherwise be served after one good faith attempt because of a failure to comply with [certain laws, including laws on registered agents], the process may be served on any of the following:
>
> > (a) Any manager of a manager-managed domestic limited liability company[.]
> >
> > (b) Any member of a member-managed domestic limited liability company[.]
> >
> > (c) Any person listed publicly by the domestic limited liability company … on its latest annual report, as most recently amended.
>
> (4) If, after due diligence, the process cannot be completed under subsection (2) and if either:
>
> > (a) The only person listed publicly by the domestic limited liability company … on its latest annual report, as most recently amended, is also the registered agent on whom service was attempted under subsection (2); or
> >
> > (b) After due diligence, service was attempted on at least one person listed publicly by the domestic limited liability company … on its latest annual report, as most recently amended, and cannot be completed on such person under subsection (3),

15

the service of process may be served as provided in [Fla. Stat. § 48.161] on the Secretary of State as an agent of the domestic limited liability company … or by order of the court under [Fla. Stat. § 48.102].

(5) If the address for the registered agent or any person listed publicly by the domestic limited liability company … on its latest annual report, as most recently amended, is a residence, … service on the … company … may be made by serving any of the following:

> (a) The registered agent of the domestic limited liability company …, in accordance with [Fla. Stat. § 48.031 ("Service of process generally …")].

> (b) Any person listed publicly by the domestic limited liability company … on its latest annual report, as most recently amended, in accordance with [Fla. Stat. § 48.031].

> (c) Any member or manager of the domestic limited liability company …, in accordance with [Fla. Stat. § 48.031].

Fla. Stat. § 48.062(2)–(5).

Florida law specifies requirements for registered agents. The law requires a limited liability company to "cause the designated registered agent to keep [a] designated registered office open from at least 10 a.m. to 12 noon and 2 p.m. to 4 p.m. each day except Saturdays, Sundays, and legal holidays … and … cause the designated registered agent to keep one or more individuals who are, or are representatives of, the designated registered agent on whom process may be served at the office during these hours." Fla. Stat. § 48.091(3) (2024).

Florida law specifies how to serve process on the Florida Secretary of State as an implied agent:

(1) When authorized by law, substituted service of process on a … business entity incorporated or formed under the laws of any other state … may be made by sending a copy of the process to the

16

office of the Secretary of State by personal delivery; by registered mail; by certified mail, return receipt requested; by use of a commercial firm regularly engaged in the business of document or package delivery; or by electronic transmission. The service is sufficient service on a party that has appointed or is deemed to have appointed the Secretary of State as such party's agent for service of process. The Secretary of State shall keep a record of all process served on the Secretary of State showing the day and hour of service.

(2) Notice of service and a copy of the process must be sent forthwith by the party effectuating service or by such party's attorney by registered mail; by certified mail, return receipt requested; or by use of a commercial firm regularly engaged in the business of document or package delivery. In addition, if the parties have recently and regularly used e-mail or other electronic means to communicate between themselves, the notice of service and a copy of the process must be sent by such electronic means or, if the party is being served by substituted service, the notice of service and a copy of the process must be served at such party's last known physical address and, if applicable, last known electronic address. The party effectuating service shall file proof of service or return receipts showing delivery to the other party by mail or courier and by electronic means, if electronic means were used, unless the party is actively refusing or rejecting the delivery of the notice. An affidavit of compliance of the party effectuating service or such party's attorney must be filed within 40 days after the date of service on the Secretary of State or within such additional time as the court allows. The affidavit of compliance must set forth the facts that justify substituted service under this section and that show due diligence was exercised in attempting to locate and effectuate personal service on the party before using substituted service under this section. The party effectuating service does not need to allege in its original or amended complaint the facts required to be set forth in the affidavit of compliance.

(3) When ... a business entity conceals its whereabouts, the party seeking to effectuate service, after exercising due diligence to locate and effectuate personal service, may use substituted service pursuant to subsection (1) in connection with any action in which the court has jurisdiction over such ... business entity. The party seeking to effectuate service must also comply with subsection (2); however, a return receipt or other proof showing acceptance of receipt of the notice of service and a copy of the process by the concealed party need not be filed.

(4) The party effectuating service is considered to have used due diligence if that party:

(a) Made diligent inquiry and exerted an honest and conscientious effort appropriate to the circumstances to acquire the information necessary to effectuate personal service;

(b) In seeking to effectuate personal service, reasonably employed the knowledge at the party's command, including knowledge obtained pursuant to paragraph (a); and

(c) Made an appropriate number of attempts to serve the party, taking into account the particular circumstances, during such times when and where such party is reasonably likely to be found, as determined through resources reasonably available to the party seeking to secure service of process.

Fla. Stat. § 48.161(1)–(4) (2023).

These facts are from counsel's affidavit, D16, and accompanying exhibits, D16-1 to D16-8.

In the defendant's most recent public filing, "Kyle E. Adams" is identified as the president and registered agent; "Tara L. Adams" is identified as the vice president; 22696 NE 130th Court Road, Fort McCoy, Florida 32134, is identified as their address; 881 State Road 20, Unit 4, Interlachen, Florida 32148, is identified as the business's mailing address; and no other person or address is identified. D16 ¶¶ 6–8; D16-1.

A licensed process server attempted to serve the defendant at the Fort McCoy address on August 9 (Friday, 9:06 a.m.), 14 (Wednesday, 8:58 a.m.), 23 (Friday, 8:21 a.m.), 26 (Monday, 10:11 a.m.), and 28 (Wednesday, 7:04 p.m.), 2024, and on October 3, 2024 (Thursday, 11:28 a.m.). D16 ¶ 9; D16-2 at 1. The process server explained that the Fort McCoy address is a residence with a

private fence, a locked gate, and no access point, and that no one responded to a horn. D16-2 at 1. Another process server conducted a two-hour "stakeout" at the Interlachen address on October 17, 2024 (Thursday, time unspecified), to no avail. D16 ¶ 13; D16-3. The process server explained, "Server attempted: 2 hour steak [sic] out. No one here door locked, no cars[.]" D16-3.

In December 2024, the plaintiff obtained the alias summons ("TO: L.A. DISASTER RELIEF, LLC c/o Secretary of State"), D12, and used the Florida Department of State's online portal, https://online-sop.sunbiz.org, to request substitute service of process on the Florida Secretary of State. D16 ¶ 16; D16-4. On January 2, 2025, the Florida Secretary of State accepted service of process for the defendant. D16 ¶ 17; D16-5.

On January 7, 2025, the plaintiff's counsel notified the defendant of the Florida Secretary of State's acceptance of service of process on the defendant's behalf by sending a copy of the complaint, D1, the alias summons, D12, and the Florida Secretary of State's notice of acceptance, D16-5, to the defendant by U.S. certified mail, return receipt requested, to the Interlachen address and by email to info@ladisasterrelief.com. D16 ¶¶ 18, 20; D16-6; D16-8. On January 15, 2025, the mailing was picked up from the Interlachen Post Office. D16 ¶ 19; D16-7.

As evidenced by counsel's affidavit, the plaintiff tried to serve the defendant's registered agent at the registered address (the Fort McCoy address)—also the address for the only two people on the most recent public filing—twice during times when the registered office should have been open for acceptance of service of process, see Fla. Stat. § 48.091(3) (2024), and four other times, D16 ¶ 9; D16-2, and also tried to serve process at the only other address on the most recent public filing (the Interlachen address) by staking

out the location for two hours, D16 ¶ 13; D16-3. By taking these actions, the plaintiff complied with the law allowing service of process on the Florida Secretary of State as an agent for a limited liability company. *See* Fla. Stat. § 48.062(2)–(5).

As further evidenced by counsel's affidavit, the plaintiff obtained process in the name of the defendant, care of the Florida Secretary of State, D12, and electronically transmitted it to the Florida Secretary of State, D16 ¶¶ 14–16; D16-4. The plaintiff's counsel notified the defendant of process, and sent the defendant a copy of process, by certified mail, return receipt requested, and by email. D16 ¶¶ 18, 20; D16-6; D16-8. The plaintiff filed proof of service and a return receipt showing delivery to the defendant by mail. D16 ¶ 19; D16-7. The affidavit was filed within 40 days of service on the Florida Secretary of State. D16-5 (acceptance of service on Jan. 2, 2025); D16 (affidavit filed on Jan. 20, 2025). The affidavit describes the six attempts to serve process by a licensed process server and the reason substituted service is authorized. D16 ¶¶ 3–13; D16-2 at 1; D16-3. These attempts constitute due diligence; a certified process server attempted service during different hours on different business days at the registered-agent address, and another process server on another day staked out the business address. D16 ¶¶ 9, 13; D16-2 at 1; D16-3. By taking these actions, the plaintiff complied with the provision for substitute service of process on the Florida Secretary of State. *See* Fla. Stat. § 48.161(1)–(4) (2023).

As evidenced by the lawyer's communication with the plaintiff's counsel, the defendant knew of the lawsuit and hired or planned to hire a lawyer to represent it, D17 ¶ 2–5, but, for a reason not detailed in the record, never appeared in the action to defend itself.

Under the circumstances, the clerk properly entered default against the defendant.

## VI.    Choice of Law

A federal court exercising diversity jurisdiction applies the forum state's substantive law, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 7180 (1938), including its conflict-of-laws rules, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). If the parties fail to address choice of law, the court presumes that the forum state's substantive law controls. *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989).

For a state-law claim, pre-judgment interest is governed by state substantive law. *Walker v. Life Ins. Co. of N. Am.*, 59 F.4th 1176, 1192 (11th Cir. 2023); *see also Herndon v. Gov't Emps. Ins. Co.*, 530 So. 2d 516, 517–18 (Fla. 5th DCA 1988) (applying choice-of-law principles to determine which law on pre-judgment interest governed). "Unlike pre-judgment interest, post-judgment interest is governed by federal law in diversity cases." *Walker v. Life Ins. Co. of N. Am.*, 59 F.4th 1176, 1194 (11th Cir. 2023).

For both the claims and the demand for pre-judgment interest, the plaintiff applies Florida substantive law without considering Florida's choice of law under circumstances involving the absence of a written agreement, services performed in Iowa by an Indiana company for a Florida company, and unpaid invoices sent to email addresses or to Florida and Iowa physical addresses. *See generally* D22. Because the plaintiff fails to consider the choice of law and the defendant has not appeared to argue for the application of a particular substantive law, the court may presume that Florida substantive law controls. *See Int'l Ins. Co.*, 874 F.2d at 1458 n.19. To the extent the common

21

law in Florida, Indiana, and Iowa does not materially differ, the choice of which common law to apply is inconsequential.

## VII.  Default Judgment

### A.  *Liability*

Before entering a default judgment, the court must ensure that the well-pleaded factual allegations state a claim upon which relief may be granted. *Nishimatsu Constr. Co. v. Hou. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).

The five claims in the complaint are pleaded in the alternative and are duplicative of one another because they are based on substantially the same facts and involve indistinct damages. Because the plaintiff's well-pleaded factual allegations state a claim for account stated (count I), D1 ¶¶ 14–24; and the plaintiff would not be entitled to additional damages on any other claim, denying default judgment on, and dismissing, the remaining claims is warranted. *See, e.g., Green Mountain Elec. Supply Inc. v. Zero Distrib. LLC*, No. 1:24-CV-00874 (MAD/DJS), 2025 WL 1677073, at *4–5 (N.D.N.Y. June 13, 2025) (ruling that the well-pleaded allegations established a breach-of-contract claim and denying default judgment on an account-stated and other claims as duplicative); *Pinnacle Towers LLC v. Airpowered, LLC*, No. 5:15-cv-81-MMH-PRL, 2016 WL 889858, at *1 n.4 (M.D. Fla. Jan. 15, 2016) (similar), *report and recommendation adopted*, No. 5:15-cv-81-MMH-PRL, 2016 WL 829079 (M.D. Fla. Mar. 3, 2016); *cf. In re Se. Banking Corp.*, 69 F.3d 1539, 1547 (11th Cir. 1995) (observing that "a single inseparable claim for relief" exists under the final-judgment rule if a plaintiff presents more than one legal theory but may

recover on only one). At the hearing on the motion for default judgment, D30, the plaintiff's lawyer agreed.

An account stated is "an agreement between persons who have had previous transactions, fixing the amount due in respect of such transactions, and promising payment." *Martyn v. Amold*, 36 Fla. 446, 452, 18 So. 791, 793 (Fla. 1895) (quoted authority omitted); *see also Merrill-Stevens Dry Dock Co. v. Corniche Express*, 400 So. 2d 1286, 1287 (Fla. 3d DCA 1981) ("Parties who have had a series of dealings with each other may reach a final accounting and agree on a balance due through an account stated[.]").

In addition to "the existence of a business relationship between the parties," *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 949 (Fla. 2020), "[f]or an account stated to exist as a matter of law, there must be an agreement between the parties that a certain balance is correct and due and an express or implicit promise to pay this balance," *Merrill-Stevens*, 400 So. 2d at 1286; *see also* Fla. R. Civ. P. Form 1.933 (Florida procedural form for an account-stated claim). If "there is no such agreement between the parties, there can be no recovery on this theory." *Mercado v. Lion's Enters., Inc.*, 800 So. 2d 753, 756 (Fla. 5th DCA 2001); *see, e.g.*, *Team Servs. Inc. v. Securitas Elec. Sec., Inc.*, No. 22-12840, 2023 WL 6890660, at *8 (11th Cir. Oct. 19, 2023) (affirming judgment for the defendant on an account-stated claim because the evidence showed that the defendant had asked the plaintiff to resubmit invoices at a lower rate and thus had not agreed to pay them). Because a claim for account stated "is based on the agreement of the parties to pay the amount due upon the accounting, and not any written instrument," a plaintiff need not "show the nature of the original debt, or … prove the specific items constituting the

account." *Farley v. Chase Bank, U.S.A., N.A.*, 37 So. 3d 936, 937–38 (Fla. 4th DCA 2010) (internal quotation marks and quoted authority omitted).

A claim for an account stated "is often based upon an implied promise." *Id.* at 937. "[W]hen an account statement has been rendered to and received by one who made no objection thereto within a reasonable time, a prima facie case for the correctness of the account and the liability of the debtor has been made." *Id.* (internal quotation marks and quoted authority omitted); *see also F.D.I.C. v. Brodie*, 602 So. 2d 1358, 1361 (Fla. 3d DCA 1992) ("[T]he practice of periodic billing in the regular course of dealing may establish an account stated if no objection to the amount of the bill is made within a reasonable time[.]"); Restatement (Second) of Contracts § 282 (1981) ("[T]he recipient's assent may be inferred from his conduct. … [H]is retention of the statement for an unreasonably long time," for example, "is a manifestation of his assent."). A mere failure to respond to a demand, however, would not establish liability unless the parties engaged in "regular periodic billing." *Page Avjet Corp. v. Cosgrove Aircraft Serv., Inc.*, 546 So. 2d 16, 18 (Fla. 3d DCA 1989). Moreover, a "debtor may overcome a prima facie case of an account stated by meeting the burden of proving fraud, mistake, or error" in the account. *Farley*, 37 So. 3d at 937 (alteration, internal quotation marks, and quoted authority omitted).

Here, the well-pleaded factual allegations state an account-stated claim on which relief may be granted. *See Nishimatsu*, 515 F.2d at 1206 (explaining the standard for default judgment). The parties had a business relationship—a series of dealings—under which the plaintiff provided the defendant with emergency cleanup services following the August 2020 derecho. D1 ¶¶ 9–11. In accord with their business dealings, the plaintiff sent the defendant invoices, deducting 10% to 20% for the defendant's profit. D1 ¶¶ 14–16; D1-3;

*see* D32-1 ¶¶ 11, 13 (clarifying that the defendant's profit was 10% for FEMA-funded projects). The defendant never objected to, or disputed, the amounts in the invoices, D1 ¶ 18; and "agreed to owe" the amounts, D1 ¶ 17. The defendant paid $176,000.00 but left unpaid a balance of $236,549.00. D1 ¶¶ 20, 21, 23; *see* § III.C, *supra* (explaining the typographical error in the complaint).

These well-pleaded factual allegations, considered admitted through default, sufficiently state an account-stated claim. *See, e.g., Raben Builders, Inc. v. First Am. Bank & Tr. Co.*, 561 So. 2d 1229, 1232 (Fla. 4th DCA 1990) ("Peat Marwick set forth an unrebutted claim to an account stated, i.e., that the parties had an agreement, that Raben accepted the services provided by Peat Marwick and thereafter failed to object to the invoiced amount."); *Basic Food Indus., Inc. v. Wackenhut Corp.*, 323 So. 2d 1, 1–2 (Fla. 3d DCA 1975) ("Plaintiff … filed a complaint alleging that at the request of the defendant …, it had furnished … security services to … fruit orchards and packing plants of the defendant …; that in spite of the fact on several occasions it had sent to the defendant invoices for services rendered (totaling $6,998.54), defendant refused to pay them. … The trial judge found that … there was an account stated between the parties. … We affirm.").

### B.    Damages

"If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing[.]" Fed. R. Civ. P. 55(b)(1). "In all other cases, the party must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2). "The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter

or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." *Id.*

A court must ensure that "there is a legitimate basis for any damage award it enters[.]" *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003). "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). An evidentiary hearing is unnecessary if "all essential evidence is already of record." *S.E.C. v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005).

A claim "for an account stated is … for a sum certain[.]" *Merrill-Stevens*, 400 So. 2d at 1286.

The plaintiff shows damages for a sum certain: the amount of the unpaid invoices ($236,549.00). *See* D32-1 ¶¶ 14–15.

Prejudgment interest is an element of damages, *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 214–15 (Fla. 1985), that a court—not the finder of fact—calculates, *Miller v. ARCPE Bahamas, LLC*, 423 So. 3d 1015, 1018 (Fla. 5th DCA 2025), based on Fla. Stat. § 55.03 (unless a contract provides otherwise), Fla. Stat. § 687.01. Under section 55.03, Florida's Chief Financial Officer sets "the rate of interest that shall be payable on judgments … by averaging the discount rate of the Federal Reserve Bank of New York for the preceding 12 months, then adding 400 basis points to the averaged federal discount rate." Fla. Stat. § 55.03(1). Interest rates are on the Chief Financial Officer's website. *See* MyFloridaCFO, "Current Judgment Interest Rates", https://www.myfloridacfo.com/division/aa/audits-reports/judgment-interest-rates (last visited Feb. 6, 2026).

Prejudgment interest begins when the debt is due, *U.S. Home Corp. v. Suncoast Utilities, Inc.*, 454 So. 2d 601, 606 (Fla. 2d DCA 1984), and "accrues until the date of the judgment after which postjudgment interest begins to accrue," *SEB S.A. v. Sunbeam Corp.*, 476 F.3d 1317, 1321 (11th Cir. 2007) (applying Florida law). "The computation of prejudgment interest is a mathematical computation and a purely ministerial duty[,]" requiring no finding of fact and permitting no discretion. *Id.* at 1320 (internal quotation marks and quoted authority omitted; applying Florida law).

A plaintiff is entitled to prejudgment interest as a matter of law on liquidated damages—a sum certain—that the defendant has refused to surrender. *Rainess v. Est. of Machida*, 81 So. 3d 504, 512 (Fla. 3d DCA 2012); *Air Ambulance Pros., Inc. v. Thin Air*, 809 So. 2d 28, 31 (Fla. 4th DCA 2002). But "interest may not be added to the amount of the judgment unless there can be a conclusive determination of ... a date from which interest can be computed." *Bryan & Sons Corp. v. Klefstad*, 265 So. 2d 382, 385 (Fla. 4th DCA 1972); *accord Chadwick v. Corbin*, 476 So. 2d 1366, 1368 (Fla. 1st DCA 1985). If a date cannot be determined, using the date the lawsuit is filed is appropriate. *Berloni S.p.A. v. Della Casa, LLC*, 972 So. 2d 1007, 1012 (Fla. 4th DCA 2008).

The plaintiff shows an exact amount on which to base pre-judgment interest ($236,549.00), *see* D32-1 ¶¶ 14–15, and a date on which the prejudgment interest can be computed (December 1, 2020). For the account stated claim, that date (i.e., when the defendant implicitly agreed it owed the invoiced amounts) is supported by the dates on the invoices reflecting invoices from August 19 to October 31, 2020, D1-3; and Vasquez Tadeo's statements in his declarations that he delivered the privately funded invoices

27

to the defendant approximately ten to fifteen days after each project's completion, D32-1 ¶ 10; that the defendant should have paid the invoices by December 1, 2020, D22-1 ¶ 19, from which an inference can be drawn that he delivered the FEMA invoices to the defendant before that day; that the defendant agreed to timely pay the invoices (i.e., each week for the work completed two weeks earlier, D32-1 ¶ 8), and had been paying them within a few days of their submission, D22-1 ¶¶ 7(d), 14; and that the defendant received the invoices and neither disputed them nor paid them in full, D22-1 ¶ 18.

Thus, the plaintiff is entitled to damages in the amount of $236,549.00 and pre-judgment interest from December 1, 2020, calculated under section 55.03, to the day of the judgment. The plaintiff's $81,669.31 prejudgment calculation (using an end day of December 23, 2025) accords with section 55.03. *See* D31 at 10–11.

Denying the plaintiff's additional request ("Plaintiff also asks that the Court confirm that all work was completed as agreed and that the full amount of the invoices is due and payable," D31 at 12) is warranted. The plaintiff provides no basis for the request, made for the first time in its supplement, which the court ordered not to add new requests but to clarify information.

## VIII. Post-Judgment Interest

Under the federal post-judgment statute, "Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). The interest is automatic, *Gele v. Wilson*, 616 F.2d 146, 148 (5th Cir. 1980); and mandatory, *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1053 (11th Cir. 1994). Indeed, "interest accrues from the date of a

judgment whether or not the judgment expressly includes it[.]" *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1339 n.37 (11th Cir. 1999) (quoted authority omitted).

Section 1961(a) governs post-judgment interest because the action is a diversity action and no agreement on interest exists. The judgment can but does not have to include language on post-judgment interest because post-judgment interest under § 1961(a) is mandatory and automatic, regardless, *see Johansen*, 170 F.3d at 1339 n.37.

## IX.    Costs

"Unless a federal statute, [the procedural] rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "The clerk may tax costs on 14 days' notice." *Id.* "On motion served within the next 7 days, the court may review the clerk's action." *Id.* The prevailing party's completion of the form "AO 133 (Rev. 07/24) Bill of Costs," on the United States Courts website, https://www.uscourts.gov/sites/default/files/2025-03/ao-form-ao-133-bill-of-costs-district-court-revised-version-10_11_24-1.pdf, assists the clerk.

Section 1920 of Title 28 of the United States Code limits a court's discretion in taxing costs. *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1225 (11th Cir. 2002). Section 1920 allows taxable costs falling in six categories only: (1) "[f]ees of the clerk and marshal"; (2) "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case"; (3) "[f]ees and disbursements for printing and witnesses"; (4) "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case"; (5) "[d]ocket fees under [28

U.S.C. § 1923]"; and (6) "[c]ompensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under [28 U.S.C. § 1828][.]" 28 U.S.C. § 1920(1)–(6).

Section 1914 of Title 28 of the United States Code specifies the fees of the clerk: "The clerk of each district court shall require the parties instituting any civil action, suit or proceeding in such court, whether by original process, removal or otherwise, to pay a filing fee of $350[.]" 28 U.S.C. § 1914(a). Section 1914 further provides, "The clerk shall collect from the parties such additional fees only as are prescribed by the Judicial Conference of the United States." 28 U.S.C. § 1914(b). Under the latter provision, the "[a]dministrative fee for filing a civil action, suit, or proceeding in a district court, [is] $55." *See* District Court Miscellaneous Fee Schedule, available on the United States Courts website, https://www.uscourts.gov/court-programs/fees/district-court-miscellaneous-fee-schedule (last visited Feb. 6, 2026).

Section 1921 of Title 28 of the United States Code specifies fees of the marshal, which include fees for "[s]erving a subpoena or summons for a witness[.]" 28 U.S.C. § 1921(a)(1)(B). "[P]rivate process server fees may be taxed" as fees of the marshal, but may not exceed the fees authorized for marshals. *U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 624 (11th Cir. 2000). The fees authorized for the marshal to collect are in 28 C.F.R. § 0.114.

Whether to tax costs is an issue that is collateral to the merits of an action. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990). A court retains jurisdiction to decide a collateral issue even after the court loses

jurisdiction over the merits. *Id.*; *accord PTA-FLA, Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1308 (11th Cir. 2016).

As stated in its application for default judgment, the plaintiff requests "entitlement to recover its costs." D22 at 12. In accordance with the rule on costs, if the court enters default judgment for the plaintiff, the court "should" allow the plaintiff to recover its costs. *See* Fed. R. Civ. P. 54(d)(1) (quoted). The docket establishes that the plaintiff paid $405 as fees of the clerk allowed under § 1920. *See* docket text accompanying D1. How much the plaintiff paid its process server as fees of the marshal under § 1921 is unknown, requiring the plaintiff to submit a bill of costs using the bill-of-costs form, *see* p. 30, *supra*, if the plaintiff wants those costs taxed. The court retains jurisdiction over the collateral matter of taxing costs without having to expressly say so.

## X. Recommendation

The undersigned recommends:

(1)    **granting in part and denying in part** the plaintiff's motion for default judgment, D22, as supplemented, D31;

(2)    **dismissing** the claims for open account (count II), D1 ¶¶ 25–33; breach of oral contract (count III), D1 ¶¶ 34–40; breach of contract implied in law (count IV), D1 ¶¶ 41–45; and breach of contract implied in fact (count V), D1 ¶¶ 46–53;

(3)    **directing** the clerk to:

(a) enter judgment in favor of ASAP Tree Service LLC and against L.A. Disaster Relief, LLC, on the account stated claim (count I) in the amount of **$236,549.00** in liquidated damages, plus **$81,669.31** in prejudgment interest to December 23, 2025, plus prejudgment interest from December 24, 2025, to the day of the judgment at the rate established by Fla. Stat. § 55.03,

plus post-judgment interest accruing from the day
after the judgment at the rate established by 28 U.S.C.
§ 1961; and

(b) close the file; and

(4)    **ordering** the plaintiff to file any bill of costs within 14 days
of entry of the judgment.

## XI.    Objections

"Within 14 days after being served with a copy of [a] recommended
disposition, a party may serve and file specific written objections to the
proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). An objection
must not exceed 10 pages. Local Rule 3.01(b). "A party may respond to another
party's objections within 14 days after being served with a copy." Fed. R. Civ.
P. 72(b)(2). A response must not exceed 10 pages. Local Rule 3.01(c). "The
district judge must determine de novo any part of the magistrate judge's
disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also*
28 U.S.C. § 636(b)(1)(C) ("A [district judge] shall make a de novo determination
of those portions of the report or specified proposed findings or
recommendations to which objection is made."). "A party failing to object
… waives the right to challenge on appeal the district court's order based on
unobjected-to factual and legal conclusions." 11th Cir. R. 3-1.

Any objections to this report and recommendation must be specific and must be served and filed by **February 20, 2026**.

**Entered** in Jacksonville, Florida, on February 6, 2026.



Patricia D. Barksdale
*United States Magistrate Judge*

c:      Timothy J. Corrigan
        United States District Judge

        Counsel of record

        L.A. Disaster Relief, LLC
        881 State Road 20, Unit 4
        Interlachen, FL 32148

        Kyle E. Adams, President
        L.A. Disaster Relief, LLC
        22696 N.E. 130th Court Road
        Fort McCoy, FL 32134